Porter *v.* The Chicago and Rock Island Railroad Co.

---

SAMUEL S. PORTER, Appellant, *v.* THE CHICAGO AND ROCK ISLAND RAILROAD COMPANY, Appellee.

APPEAL FROM PEORIA.

Carriers by railway are neither bound to deliver to the consignee personally, or to give notice of the arrival of the goods, to discharge their liability as such. But they must take proper care of the goods, by safely storing them or by some other act.

When the articles to be transported, have arrived at their destination, and have been removed and stored in a warehouse which is owned by the carrier, or by some other party, the duty of the carrier is terminated. If the goods are stored in a building owned by the carrier, the liability changes to that of warehouseman.

Because goods were destroyed in a railroad car, by an accidental fire, the carrier is not thereby released. It is the duty of the carrier to show what becomes of goods entrusted to him; the burthen of proof is with him.

THIS was a suit commenced in the Peoria Circuit Court, by appellant against appellee, upon certain bills of lading or railroad receipts for wheat and corn, shipped by plaintiff from Peoria over the defendant's road, to Munn, Gill & Co., of Chicago.

The case was tried, March term, 1858, before E. N. POWELL, Judge, without a jury.

The evidence showed that the plaintiff, by Updike & Co., sent over the defendant's railroad, on the eleventh and ninth days of August, 1856, five car loads of wheat and four car loads of corn, each car containing one hundred and sixty sacks, each sack holding two and one-fourth bushels, consigned to Munn, Gill & Co., of Chicago, who were commission merchants and agents of plaintiff for the sale of the grain, and that the said Updike & Co. received from the company receipts similar to the following:

PEORIA, ILL., August 11th, 1856.

Received in good order, from Updike & Co., to be forwarded by the Peoria & Bureau Valley Railroad, the following articles, to be delivered in like good order to Munn, Gill & Co., at Chicago Station, he or they paying freight at the rate of seventeen cents a hundred pounds.

| MARKS. | ARTICLES. |
|---|---|
| Acct. S. S. Porter. | 3 Cars Wheat, No. 468, 616, 394. |

D. S. THOMPSON.

That Munn, Gill & Co. received from defendant and sold a part of this grain. That the balance of said grain was destroyed by fire on the night of the 13th August, 1856, in the depot of said company in Chicago.

*R. T. Gill,* one of the firm of Munn, Gill & Co., testified that they received notices of the arrival of cars on August 9, 1856, August 11, 1856, and August 13, 1856, similar notice of car 272. That about the 1st July, 1856, witness directed defendants, by Mr. Jones, the local freight agent, to have all grain received for them to be delivered at Flint & Wheeler's warehouse; and subsequently gave directions to have certain car loads delivered on the track, but only such cars as were particularly specified. Witness stated that there was no written notice given to Jones, and no other notice was given by Thomas or by any member of said firm to his knowledge, and that they did sometimes receive grain from the warehouse in bags without objection, subsequent to the time of the notice.

*Charles H. Ball* testified that he went into the employ of Munn, Gill & Co. in July, 1856. That the defendants at that time were in the habit of delivering grain for Munn, Gill & Co.

at Flint & Wheeler's warehouse, and so continued, except in some cases when orders were given to the contrary.

The following facts were agreed upon: That by the charter of the defendant, it was not permitted to charge storage on goods in their warehouse, after such goods were delivered at place of destination. That it is not the custom of defendant to charge storage on goods transported by it, but that after such goods have been kept a reasonable time, the same have been carried to other warehouses. That Duty S. Thompson was defendant's agent at time of signing the bills of lading.

*Thomas D. Winter's* deposition was read by defendant, who testified that some of the printed notices sent to Munn, Gill & Co., as testified by Gill, were made by himself from authority from Joseph Jones, local freight agent; that he had no personal knowledge when the cars specified in the notices actually arrived in Chicago.

*John Comisky* testified that the cars, with exception of car 282, were unloaded at the depot in Chicago, on the 12th and 13th August, 1856, and that it was the custom of the company to have the cars unloaded as quickly as possible after arrival; that Munn, Gill & Co. had given him orders to have all grain that came in bags unloaded at the depot, until further orders. This witness stated that he kept no memoranda of dates of arrival of the cars, but knows that they were in the depot on the night of the fire.

*J. Jones, Jr.,* testified that he was local freight agent, at Chicago, of defendant; that the depot at Chicago was burned on night of 13th August, 1856, caused by the heat from buildings opposite. The grain in the cars named arrived a few days before the fire; don't know when notices were sent, but the clerk, whose business it was to send notices, had orders to notify parties immediately upon arrival of way bills, and it was the custom so to notify them without reference to whether the freight had arrived or not.

*Thomas D. Jamieson* testified that about 8th or 9th August, 1856, he received a written order from Munn, Gill & Co. to put in five cars of grain in bags in depot; two days afterwards Charles H. Ball gave me verbal notice to put all grain in bags for Munn, Gill & Co. in depot, as they had a warehouse of their own and could haul it cheaper than to store at Flint & Wheeler's.

MANNING & MERRIMAN, for Appellant.

JUDD & WINSTON, N. H. PURPLE, GLOVER & COOK, and G. C. CAMPBELL, for Appellee.

27

WALKER, J. The questions presented by the record in this case involve the determination of the extent of the liability of carriers by railway. And upon an examination of the reported cases, it will be found that there is some conflict as to what acts, after the arrival of the goods at their destination, will discharge them from their liability as carriers. It has been said, and we think with reason, " that the cases have settled the question that carriers by railway are neither bound to deliver to the consignee personally, or to give notice of the arrival of the goods, to discharge the liability of common. carrier." Redfield on Railways, 251. This mode of transportation is so essentially different from that by wagons and other vehicles, that a delivery to the consignee, at his place of business or residence, would be unadapted to their nature and the course of business by which they exist. // And yet, to say that all duty ceases upon an arrival at the terminus of the road, or at their destination upon the route of the road, would be to leave the owner to a great extent unprotected, and to require less at the hands of the carrier than the law would seem to sanction. To hold that they were thus relieved from the liability of carriers, would be to leave the owner to contend with the same difficulties in showing theft, embezzlement or loss by negligence by the carriers, their agents and servants, that he would have had at any time after they were first placed upon the road. The goods are still as completely under the control of the carrier as before, and the owner or consignee would be as effectually precluded from exercising any control over them. He could do no act for their security and protection while locked up in the car, and none but the carrier and his agents and servants could even know that they had arrived. We are strongly inclined to the belief that no decision can be found that such act releases them from their liability of carriers, and that it should not, without something further on their part.

While there is some conflict in the evidence as to whether this grain should have been delivered at Flint & Wheeler's warehouse, it seems that the preponderance shows that all grain, in bags, consigned to Munn, Gill & Co. which arrived after the 11th of August, was to be stored in the depot. And the evidence shows this grain was all in bags, and the evidence tends to show it arrived after that time; and no delivery was made in the car or otherwise after its arrival.

The evidence shows that all of the grain, with the exception of that contained in one car, had been unloaded and placed in the defendant's freight depot before the fire occurred by which it was destroyed. The question then presents itself, whether, as to that portion destroyed by fire in the warehouse, the defend-

ant's relation of carrier had ceased, and on this point there seems to be some diversity in the decided cases. While some hold that such character does not cease until the consignee has had notice and reasonable time to remove the goods, others have held that the carrier's duty ceases as soon as the goods are taken from the cars, and safely stored in a warehouse of the company, or that of some other person. In the case of *Thomas* v. *The Boston and Providence Railway*, it was held, that " where suitable warehouses are provided, and the goods *which are not called for* on their arrival at the places of destination are unloaded, and stored safely in such warehouses, the duty of the proprietors as common carriers is, in our judgment, terminated." 10 Met. R. 472. This decision is supported by the cases of *Moses* v. *The Boston and Maine Railway*, 32 N. H. R. 523, and *The Norway Plaines Company* v. *The Boston and Maine Railway*, 1 Gray R. 263. In the latter of these cases, the court says, that " this view of the law, applicable to railroad companies as common carriers of merchandise, affords a plain, precise and practical rule of duty, easy of application, well adapted to the security of all persons interested. It determines that they are responsible, as common carriers, until the goods are removed from the cars and placed upon the platform ; and if, on account of their arrival in the night, or at any other time, when, by the usage or course of business, the doors of the merchandise depot or warehouse are closed, or, for any other cause, they cannot then be delivered, or if, from any reason, the consignee is not there to receive them, it is the duty of the company to store them safely, under the charge of competent and careful servants, ready to be delivered, and actually deliver them, when duly called for by parties entitled to receive them ; and for the performance of these duties, after the goods are delivered from the cars, the company is liable, as warehousemen or keepers of goods for hire." The court also held that notice to the consignee was not necessary to exonerate the railroad of its liability as a common carrier.

This doctrine, it seems to us, is well adapted to this mode of transportation and the general course of business of the country, as at present conducted. The goods have then reached their destination, and the owner or consignee, by the use of diligence, may be there to receive them, and take them into his own control, and failing to do so, the presumption should be that he has elected to permit them to be stored by the company, to be held as warehousemen or keepers for hire. The goods are then placed in precisely the same situation as goods in any other warehouse. And the owner has the same opportunity to estab-

lish the liability of the company in their new capacity of ware-
housemen, as he would have in any other case of a warehouseman.

The fact that the goods in the car were destroyed by an
accidental fire, would not excuse the defendants from liability as
common carriers. Story on Bailment, 128. Their undertaking
as common carriers holds them liable for all losses, except those
occasioned by the act of God or the public enemy. Ibid. sec.
529. " And when a loss occurs, the *onus probandi* is on the
carrier, to exempt himself from liability, for *prima facie* the
law imposes the obligation upon him. It will, therefore, be
sufficient *prima facie* evidence of loss by negligence that the
goods have never been delivered to the bailor or his agent, or
to the consignee." Ibid. sec. 529.

In this case, it appears, from the evidence, that the contents
of one of the cars had not been unloaded and placed in the
depot, and for the failure to deliver the grain destroyed in it,
the defendants would be liable, and the court below having
failed to render judgment for the value of its contents, commit-
ted an error, for which the judgment of that court should be
reversed and the cause remanded.

*Judgment reversed.*