# Illinois Central Railroad Company

*v*

# Cobb, Christy & Co.

1. CARRIER *of property—title of plaintiff to enable him to sue.* The plaintiffs, having a contract with the government to furnish supplies of grain at Cairo, employed A to make purchases for them, which he did along the line of defendant's road in his own name. Under his contract with plaintiffs he shipped the grain on defendant's road to one of plaintiffs at Cairo, where the same was to be inspected, and at the same time drew on plaintiffs for the cost, and forwarded to them the bills of lading. In a suit by plaintiffs against defendants for a failure to deliver a portion of the grain and for unreasonable delay in forwarding and delivering a portion at the place of destination, it was insisted that, under the contract with A, the grain was not the property of plaintiffs until it had passed inspection at Cairo: *Held,* that plaintiffs, upon the payment of the drafts upon them for the cost of the grain, acquired a special property in the grain which would enable them to maintain the suit; and that, from the moment the grain was shipped and the bills of lading transmitted to them, and the bills drawn upon them, they acquired, even as against A, a special property in the grain which placed it beyond his control, and gave plaintiffs, virtually, all the rights of an owner.

2. SAME—*military control of road as a defense for delay.* The fact that the government, through the military, during the late civil war, required a railroad company to give preference to government freights, and for that

purpose exercised more or less the right of determining for what persons shipments should be made, but did not control the movement of trains, when the company held itself out as a common carrier and run its regular trains, carrying private as well as government freights, with and without permits, and received shipments, giving bills of lading therefor, will furnish no excuse to the company as a carrier for not delivering according to its legal obligation within a reasonable time. Such military control might have justified the carrier in refusing freights, but having received them, did not excuse the delay in transportation.

3. SAME—*what is unreasonable delay.* Where it appeared that the ordinary time required for freight cars to run from the point where grain was accepted for shipment, to its destination, was two or three days, and that, of 125 cars of grain shipped, only ninety-five ever reached the place to which they were shipped, and that their average time was over thirty days, the delay was held unreasonable, and that the company could not excuse such delay on account of blockades on its side-tracks and other difficulties known to itself at the time of accepting the grain.

4. SAME—*duty of carrier on failure of consignee to receive freight.* It is the duty of consignees to receive freight when notified of its arrival at its destination, but if they fail to do so, it is the duty of the carrier to warehouse the goods and take reasonable care of them for a reasonable time.

5. SAME—*excuse for delay in transportation.* Where the principal cause of delay in transporting grain by a railroad company was a great accumulation of loaded cars at all its stations for a great distance on its road, and the fact that the company had undertaken to carry more freights than it could manage successfully, it was *held,* that even if the plaintiffs and their agents were in some degree of fault in not receiving grain more promptly, it would not excuse the company for delay in transporting other grain shipped to plaintiffs.

6. SAME—*refusal to accept for transportation.* Where the military of the United States were exercising a limited control over the operations of a railroad company during the late war, and the shipments were immense, so that the side-tracks of the road for a considerable distance were filled with loaded cars of freights, and the side-tracks at its terminus were blockaded with loaded cars waiting to be unloaded by the military authorities: *Held,* that it was the right and the duty of the railroad company to refuse to accept perishable freights for shipment to its terminus until its line was clear and it could transport the same without unreasonable delay, except upon special contract providing against liability.

7. SAME—*orders of military officer as an excuse.* A railroad company, when sued for an unreasonable delay in transporting corn to Cairo, will not be excused by the fact that the government quarter-master had requested its superintendent to instruct his agents along the line to forward

hay, intended for the use of the army during the civil war, in preference to grain. Such order could have no bearing on grain already shipped, and as to that subsequently shipped, it was the wrong of the company in receiving it, knowing that it could not be seasonably forwarded.

8. SAME—*measure of damage for non-delivery.* Where the plaintiffs had contracted for the sale of corn to the United States, at Cairo, at $1.50 per bushel, and lost the benefit of such sale on account of the non-delivery of the same within a reasonable time after shipment: *Held,* that if the managing officers of the railroad company, upon whose road the grain was shipped, had knowledge that the corn was intended for the government, the plaintiffs were entitled to recover of the company on the basis of the price they were to have received from the United States, and were not limited to the market value of corn in Cairo.

9. SAME—*special damages—notice.* The rule as between vendor and vendee, or shipper and carrier, is, that where the article is destined for a special purpose, that fact should be communicated to the vendor, or carrier, if it is to be made the foundation of special damages against them, and if it is of a character likely to affect the action of the vendor or carrier.

10. Where the owner of corn, shipped to him at Cairo, had sold the same to the government at $1.50 per bushel, which was more than the market value of corn at that place at the time when it should have arrived, the rule would not require that the owner should communicate to the carrier the terms of the contract of sale in order to recover the contract price as damages. It will be sufficient if the carrier knew the corn was intended for the government.

11. But when the government, on the first day of April, notified the shipper that it would receive no more grain after the tenth of that month, under the contract, good faith required the shipper to communicate the knowledge of this fact to the carrier, if he expected to hold him liable for the contract price on corn shipped after the first of April. For corn shipped after the lapse of a reasonable time in which to give this notice to the carrier, the owner should be confined to the market value of the grain at the place of destination at the time when it should have been delivered, unless such notice was given.

12. SAME. In the same case, it was urged that plaintiffs should have gone into the market at Cairo when the shipments failed to arrive, and bought corn to fill their contract, and not having done so, could only recover the market price: *Held,* that the law made no such requirement.

13. PLEA—*statute of limitations—to amended counts.* In a suit against a railroad company to recover for neglect and delay in the transportation of grain, and non-delivery, the plaintiff filed two amended declarations, setting up shipments of corn by different persons from different places, and at different times from those in the original declaration. The defendant,

to these new counts, pleaded the statute of limitations—that the causes of action did not accrue within five years before leave was given to file such counts, with an averment that they set up new causes of action. The court below sustained a demurrer to the pleas: *Held*, that the court erred.

14. AMENDMENTS—*to obviate statute of limitations.* While it may be true that courts should be liberal in allowing amendments to avoid the running of the statute of limitations, yet it should be confined to cases where the original cause of action is re-stated. The plaintiff can not, by bringing in a new cause of action by way of amendment, avoid the bar against it.

APPEAL from the Circuit Court of McLean county; the Hon. THOMAS F. TIPTON, Judge, presiding.

The facts necessary to an understanding of the points decided, are stated in the opinion.

Messrs. HAY, GREENE & LITTLER, and Messrs. WILLIAMS & BURR, for the appellant.

Mr. HAMILTON SPENCER, and Messrs. WELDON & BENJAMIN, and Mr. T. D. LINCOLN, for the appellees.

Mr. CHIEF JUSTICE LAWRENCE delivered the opinion of the Court:

During the winter of 1864–5, Cobb, Christy & Co., appellees, were engaged in furnishing corn and oats at Cairo for the use of the army.   They made large purchases of these articles through one Fallis, along the line of the Illinois Central Railroad.   The shipments were made to Cobb, Blaisdell & Co., for account of Cobb, Christy & Co., the senior member of each firm being the same person.   These firms had a contract with the government, made in the name of Cobb, on the 10th of January, 1865, for the delivery at Cairo of five hundred thousand bushels of corn and one hundred thousand of oats, at the rate of from 150,000 to 200,000 bushels of corn per month, at $1.55 per bushel, or $1.50 if paid on delivery.   This

is one of a series of suits brought by Cobb, Christy & Co. against the appellant as a common carrier, for failing to deliver at Cairo, in a reasonable time, large quantities of corn shipped on appellant's road. The appellees claim that, in consequence of such failure, they lost the opportunity of delivering the corn on their contract, and that they are now entitled to the contract price from the appellant as damages. They recovered on that basis in the circuit court, and the railway company has prosecuted an appeal.

It is first urged as a ground of reversal, that the plaintiffs did not own the corn which the company failed to deliver. It is insisted that, by the terms of the contract under which Fallis bought the grain along the line of the road, it was not to become the property of the plaintiffs until after it had passed inspection in Cairo. Conceding that, by the terms of the contract between the plaintiffs and Fallis, he was not their agent in such a sense as to give him the right to buy corn in their name and on their credit, and that they did not become the absolute owners until after the corn had passed inspection, still, under the facts disclosed in this case, they had an unquestionable right to bring this suit. By the arrangement between them and Fallis, he drew on them for the cost of the corn as soon as he shipped it, at the same time forwarding the bills of lading. These drafts they paid, and thus acquired a special property in the corn which would enable them to maintain this suit and recover, as their damages, the value of the corn in Cairo under their contract, if there were no other obstacles to their recovery than that raised upon the question of ownership. From the moment the corn was shipped, and the bills of lading were transmitted to them, and bills of exchange drawn upon them, they acquired, even as against Fallis, a special property in the corn which placed it beyond his control, and, indeed, gave them, virtually, all the rights of an owner. The question of inspection may be a very important one as between Fallis and the plaintiffs when they come to settle their accounts, but when the corn arrived in Cairo the

plaintiffs had the right to waive inspection, or even to receive it after it had been rejected. The provision for inspection was inserted merely for their benefit, and to give them the right to avoid all responsibility until inspection had been passed. But they could assert their ownership without inspection if they thought proper, and assert such rights of action as are the incidents of ownership. It can not be doubted that a recovery in this action, on the basis upon which a recovery has been had, would bar any other action by Fallis, as he would occupy the same position that he would have held if the corn had passed inspection. 2 Redf. on Railways, 190 ; *White* v. *Bascom*, 28 Vt. 268 ; *Green* v. *Clark*, 13 Barb. 57 ; 2 Kernan, 343.

It is next urged, as a reason for reversal, that the government had taken military possession of appellant's road, and appellant had thus ceased to be a common carrier. This question was considered by this court in the case of this same appellant against McClellan, 54·Ill. 58. We have again given it a very deliberate consideration upon the evidence and arguments now before us, and we see no reason to change the opinions then expressed. As the question was then fully discussed, we do not deem it necessary to enter upon it at any length. The utmost that can be fairly said of the evidence is, that it shows the government required the appellant to give preference to government freights, and for that purpose exercised more or less the right of determining for what persons shipments should be made. But Arthur, the general superintendent, testifies that the government did not control the movement of trains, and had nothing whatever to do with that. The company still continued in the exercise of its functions as a common carrier, running regular trains wholly at its own discretion as to time and management, and carrying private as well as government freights, with and without government permits. It held itself out to the world as a common carrier and did the business of one, issuing bills of lading as in the present case, in the ordinary form, and without

any reference in them to the supposed military control.   In one respect, indeed, it may be fairly said that the interference of the government had suspended its functions as a common carrier.   It is the duty of a common carrier to receive freight for all persons alike without discrimination.   The road was so far under governmental control that the company could not be held liable for refusing freights when it would not be safe to undertake their carriage, or for discrimination in consequence of military orders ; and on this principle we decided the Ashmead case, 58 Ill. 487.   But when it thought proper to receive freight and issue its bills of lading therefor, it was acting as a common carrier, and can not escape the liability attaching to that function.

But in these cases we do not perceive that the question is specially important.   So far as the time of delivery is concerned, a common carrier is only held to a reasonable time. In these cases, whether a common carrier or not, the appellant received this corn upon an undertaking, for a valuable consideration, to transport it to Cairo.   Independently of the special obligations of common carriers, the law would imply, as one of the terms of this contract, that it was to be performed in a reasonable time.

It is next urged by appellant's counsel that there was no unreasonable delay, under the circumstances, in the transportation of this corn.   On this point we may again cite the case of McClellan, in 54th Illinois, where this question was discussed upon a state of facts substantially the same as that presented by this record.   The proof shows that the ordinary time required for freight cars to run from the places where this grain was shipped, to Cairo, is from two to three days.   In the case before us, only ninety-five cars, of the one hundred and twenty-five in controversy, ever reached Cairo at all, their average time being over thirty days.   The shortest time was six days, and only one went through in that time.   As to those that did not go through at all, we infer, from the evidence, their contents were so badly damaged by the long delay upon

the road that it was deemed useless to forward them, and the corn was sold at different places for whatever it would bring. The same excuses are alleged for this delay that were urged in the McClellan case, *supra*, and it is not necessary to repeat what was there said. Our confidence in the conclusions then announced, and in the reasons given for them, is not shaken. It appears the government would not permit the company to unload the cars that passed inspection, but insisted on doing this work itself, and unloaded an average of only about sixty per diem, as claimed by appellant. There was accommodation on the side-tracks at Cairo for only about three hundred or three hundred and fifty cars, and this was wholly occupied in March and April by cars of accepted and rejected corn, waiting to be unloaded. There was a good deal of delay in unloading the rejected corn consigned to Cobb, Blaisdell & Co., owing to the want of storage room in Cairo. A part of it was received by them, but on the 1st of April they gave notice to the agent of the company that they would receive no more rejected corn.

It is strenuously urged by counsel for appellant that the delay in transporting corn was owing to this blocking of the side-tracks at Cairo, and that this was due, in part, to the delay of the government in unloading accepted corn, and in part to the delay of Cobb, Blaisdell & Co. in receiving the rejected corn, and to their final refusal to receive it at all. It is urged that, for the government's delay, appellant was not responsible, and as to the delay in unloading the rejected corn, to which the company charges the greater part of the difficulty, it is claimed that this was the fault of the plaintiffs, and that its consequences are not to be visited upon the appellant.

It has been several times said by this court that it is the duty of consignees to receive freight when notified of its arrival at its destination, and if they fail to do so, it is the duty of the carrier to warehouse the goods and take reasonable care of them for a reasonable time. *Porter* v. *C. & R. I. R. R. Co.*

20 Ill. 407; *C. & A. R. R. Co.* v. *Scott,* 42 ib. 132 ; *I. C. R. R. Co.* v. *Frankenberg,* 54 ib. 94. This is the general rule. 2 Red. on R. 65 ; Angell on Carriers, sec. 291. Conceding that plaintiffs, or their agents, were in some degree of fault in not relieving assignee of the rejected corn more promptly, does this fact, or does the delay of the government, excuse appellant for the delay in transporting the corn in controversy in these cases? We are of the opinion that it does not.

The real cause of the great delay and confusion in transportation was not the crowded condition of the side-tracks at Cairo, but another circumstance, for which the company was alone responsible. It appears, from the evidence of its officers, that its side-tracks at all the stations, for a long distance above Cairo, were crowded with loaded cars waiting to be forwarded to Cairo. The number of these cars is variously estimated at from eight hundred to a thousand. Now, the block at Cairo might have been relieved in two or three days, and if the company had not undertaken to transport so much more freight than it was able to take through, and thus caused this immense accumulation of loaded cars along its track, there need have been no difficulty. There were but about three hundred cars at Cairo, and the government was taking daily about sixty. Two days or thereabouts would thus have disposed of all the sound corn there ; and the rejected corn, if the consignees had refused to receive it when tendered, might have been sold during that time by the company for what it would bring. But, as urged by the counsel for the company, if this course had been taken by the company with the rejected corn, or if it had been thrown upon the ground, the place thus made vacant upon the side-tracks at Cairo would have been immediately filled again by corn brought from above. The block would thus have been renewed, and this process would have to be repeated again and again. This is true, and this difficulty was one of the company's own creation, and for which it must bear the consequences. The

trouble lay in the accumulation along the line.    To show further the practical working of this accumulation, it is only necessary to advert to the testimony of one of the appellant's agents.    He testifies that the cars first placed upon a side-track along the line would necessarily be the last to come forward from such track.    It thus happened that, instead of freight arriving in Cairo in the order of its shipment, as it should have done, corn was constantly arriving in advance of that which had been shipped long before.    This explains the fact that the average detention on the line, of the cars now in controversy, was over a month, though large quantities of corn were going forward every day.    The officers of the company knew, or must be taken to have known, this condition of their road, and they were the only persons who did know it in its full extent.    As soon as this blockade began along the road, it was not only the right of the company, but its plain duty to refuse to receive more corn for shipment until its line was clear.    On no principle of law can it be excused for accepting corn which it knew at the time it could not properly transport.    The more imminent the peril to the freight, the greater was the obligation of the carrier to refuse it, except upon a special contract.    To permit the carrier, without a special contract, to escape liability for great delay on the ground that it was unavoidable, when the causes likely to produce it were known to him at the time of the shipment, and the result of his own negligence, would violate the principles lying at the foundation of the law of common carriers. Even if the risk is known to both parties, the carrier voluntarily assumes it when he accepts the shipment without condition.    It is in vain, on this point, to urge the condition of the country and military control.    The government officers sometimes directed appellant to ship corn for certain persons, but the time of doing it and the regulation of its trains were, with rare exceptions, left wholly to its own discretion. It can not be claimed that this accumulation of corn along the line was the result of military orders.    All that the government

desired to secure in regard to the transportation of corn or other forage was, that there should be an ample supply at Cairo, and not that nearly a third of the freight cars of the company should be laid up along its line. Counsel for appellant cite the case of *The G. & C. R. R. Co.* v. *Rae*, 18 Ill. 488, and urge its authority as excusing their delay. But if that case is carefully examined, it will be seen that the real question was whether the carrier could be excused for refusing to undertake to carry grain on the ground that there was a great and unexpected accumulation along its line which it had not the means of carrying, while it had sufficient means for the ordinary business of the road. The court held it excusable. This question was very different from that presented when the carrier, who has undertaken to transport grain which he knew would be subjected to great and dangerous delays, makes a like excuse for permitting it to spoil upon his hands in consequence of delay before reaching its destination. What the court said in that case in regard to the accumulation of grain being an excuse, evidently has reference to the plaintiff's claim for damages because the carrier refused to receive. The plaintiff seems also to have claimed damages for delay of grain shipped, but the court says the grain was not lost or damaged by being detained at Rockford, and if it was not delivered at Chicago in reasonable time the plaintiff was entitled to damages if he suffered any by the fall of prices. The court held the carrier excusable in that case only for not undertaking to carry grain when it knew it could not carry safely, and that is precisely what the carrier should have done in this case. Here was the point where it could have fallen back on military interference and the peculiarities of the situation arising from the war, and have said to these plaintiffs and to all others desiring to ship; that it must refuse all corn until that already blocked along its line had gone forward and it could receive shipments with safety to itself and to the shipper. For such refusal the law would have excused it.

Appellant relies somewhat upon a verbal promise, said to have been made by Fallis when this grain was shipped, that the corn then going forward to plaintiffs should be unloaded promptly. We do not think this affects the case. It does not appear that there was any delay in unloading after this promise, which caused the delay in the transportation of the corn in controversy, and, indeed, the witness Forsyth does not state the time when the promise was made.

It is also said that, on the 3d of April, the appellant was ordered by the government quarter-master to forward hay in preference to grain. It was a mere request to the superintendent to instruct his agents along the line to that effect. But that order could have no bearing on grain already shipped, and as to that subsequently shipped it could not affect the liability of the company. It was the greater wrong on the part of the company that it should receive corn in its cars, knowing it could not be transported in consequence of this order until it would be spoiled or damaged by the delay.

It is not necessary to dwell longer on this point. The appellant having received this corn upon its cars as a common carrier, and under a contract to deliver it in Cairo, and knowing, too, the liability of corn in cars to be damaged in a few days at that season of the year, was bound to deliver it at its destination in a reasonable time. This it did not do. It attempts to excuse itself by alleging the extraordinary condition of its road. That condition was known to it when it loaded this corn upon its cars, and known to it alone in the full extent. That condition was caused by itself. If it had declined all shipments of corn except so far as it could be handled at Cairo, there would have been none of this difficulty. The blockade was not the growth of a day. It must have grown gradually, and it continued through March and to the middle of April. No serious effort seems to have been made to remove it, and it is a striking circumstance that one-third of all the cars that came to Cairo during that time were loaded with

private freights—that is, freights not designed for the government—all of which the company might have declined to receive, and thus have rid itself of the blockade and escaped all this difficulty. We hold the company was in fault in permitting this blockade to form, in not removing it when it was formed by declining to accept further shipments until its line was free, and then keeping it free; and especially in fault in accepting freights which it knew itself unable to deliver in a reasonable time.

In the particular case now under consideration, the plaintiffs, by leave of court, filed two amended declarations, setting up shipments of corn by different persons from different places, and at different times from those described in the original declaration. Defendant pleaded the statute of limitations to these additional counts, to the effect that the cause of action did not accrue within five years before they were filed or before leave was given to file them, with an averment that they set up new causes of action. The court sustained a demurrer to this plea.

We are of opinion the plea was good. The new counts set up entirely new causes of action. Counsel for appellees cite various authorities for the purpose of showing that courts should be liberal in allowing amendments for the purpose of avoiding the running of the statute. These authorities, however, are cases where the amendment was for the purpose of re-stating the cause of action in the pending suit, and not for the purpose of introducing a wholly new and different cause of action. The rule contended for by appellees would substantially break down the protection intended to be given by the statute. If A has two notes against B, one of which is barred by the statute and the other not, he could not enforce payment of the first note by joining it in a suit upon the second. If, however, he commences suit on the second before the statute has run against either, and afterwards, the statute having run in the meantime against the first note, seeks to recover upon it by adding a new count to his declaration in

the pending suit, it is claimed he may do so. Why should this be permitted any more than to unite in the first instance a note barred with one not barred? The two cases are the same in principle. When a new count is added, a distinct suit could not be brought on the outlawed note, and it has not been included in the pending suit. How, then, can its payment be enforced by adding a new count in the pending suit? How can a note, which the law pronounces dead, be vitalized by amending the declaration in a suit brought upon another cause of action? This seems plain upon principle, but we cite the following authorities: *King* v. *Avery*, 37 Ala. N. S. 173; *Holmes* v. *Moreland*, 1 McLean, affirmed in 7 Pet. 171; *Woodward* v. *Ware*, 37 Maine, 564; *Skonegan Bank* v. *Cutler*, 49 ib. 315.

It is claimed for appellant that the plaintiffs should not have been permitted to recover the price at which the corn was contracted to the government without proof that the carrier was notified of the existence of such contract. It is insisted that, in the absence of such notice, the market price of corn in Cairo must limit the recovery.

The rule undoubtedly is, as between vendor and vendee, or shipper and carrier, that where the article is destined for a special purpose, that fact should be communicated to the vendor or carrier if it is to be made the foundation of special damages against them, and if it is of a character likely to affect the action of the vendor or carrier. *Hadley* v. *Baxendale*, 26 E. L. and Eq. 402; *Griffin* v. *Colver*, 16 N. Y. 490.

The fact that this corn was intended for the government was undoubtedly known to the managing officers of the company, and we are not of opinion that this rule, as expounded in these cases, requires that the shipper should communicate to the carrier the terms of a contract of sale in order to recover the contract price as damages, except so far as there may be some feature in the contract likely to affect the carrier's action. Such a feature was introduced into this contract on the 1st of April, and it should at once have been communicated to

the carrier.  We refer to the notice given on that day by the government to the plaintiffs, to the effect that they would receive no more grain on their contract after the 10th of April. Good faith required that notice of this fact should at once have been given to the carrier if the plaintiffs expected to hold the appellant responsible for the contract price on corn shipped after that day, and after the lapse of a reasonable time for giving the notice.  As to the corn shipped after the lapse of a reasonable time to give this notice to the company, the plaintiffs should be confined to the market price at Cairo at the time the corn ought reasonably to have arrived there, unless proof shall be made that the notice was given.

It is also urged that the plaintiffs should have gone into the market at Cairo and have bought corn to fill their contract, and that, not having done so, they can only recover the market price.  However this might be, if they had not already invested their money in the corn in controversy, we can not so hold in the present case.  It would be very unreasonable to require one, who has bought and paid for an article, to have the money in his pocket with which to buy a second, in case of non-delivery of the first.  This demand comes with an ill grace from a party by whose fault there has been a failure of delivery.

By the terms of the contract the government was to pay $1.55 per bushel unless the quarter-master had the money on hand at delivery, in which event the price was to be $1.50 per bushel.  This is equivalent to a sale for cash at $1.50 per bushel, and should be considered the contract price in assessing damages.

It is probable, however, that both of these points will be immaterial on another trial, in view of what is said in the opinion in another of these cases, where the petition of Cobb to the Court of Claims was admitted in evidence, in regard to the effect of that evidence.

As already remarked, there are five of these suits, submitted upon the same arguments and substantially the same evidence

so far as concerns the main questions which we have here discussed. The questions peculiar to the other cases will be separately considered.

The copy of Cobb's petition in the Court of Claims was excluded in this case for want of a sufficient certificate. A new certificate was procured and the petition was admitted in the other cases. We will consider the effect to be given to it in an opinion to be filed in one of those cases.

For the errors indicated this judgment is reversed and the cause remanded.

*Judgment reversed.*