## Michigan Central Railroad Company v. J. H. Harville et al.

### Gen. No. 13,389.

1. COMMON CARRIER—*duty of, upon non-delivery to consignee.* On refusal of freight by a consignee or non-delivery through other obstacles, the carrier should notify the consignor or persons known by it to be the owners of or interested in the freight.

2. COMMON CARRIER—*what evidence competent in action for failure of, properly to care for consigned goods.* In such an action the original shipping receipt and other matters of the history of the shipment which collaterally throw light upon the contract of safe carriage and delivery implied from the carrier's reception of the goods, and its default, are competent, material and admissible.

3. COMMON CARRIER—*what evidence competent in action for failure of, properly to care for consigned goods.* In such an action expert testimony is competent which tends to prove the good condition of the fruit, which was the subject-matter of the shipment, when received by the carrier.

4. COMMON CARRIER—*duty of, on refusal of freight.* On refusal of freight by a consignee or non-delivery through other obstacles, notice should be sent by the carrier to persons known by it to be owners or interested in the goods.

5. AMENDMENT—*when order authorizing, operates ipso facto as.* An order in form, "that all the papers and proceedings herein be and the same are hereby amended by discontinuing," etc., operates *ipso facto* as an amendment without the filing of a formal amended pleading.

6. DECLARATION—*how duplicity in, must be availed of.* Duplicity in a declaration can only be reached by special demurrer.

7. DECLARATION—*when does not set up new cause of action.* A new cause of action is not introduced by an amendment which retains the identity of the matter on which the suit is founded.

8. PLEA—*when deemed to entire declaration.* A plea to the "amended declaration and the additional counts" is a plea to the whole declaration, although but one count of it was amended at the time the plea was filed.

' Assumpsit. Appeal from the Circuit Court of Cook County; the Hon. THOMAS G. WINDES, Judge, presiding. Heard in this court at the October term, 1906. Affirmed. Opinion filed October 3, 1907.

WINSTON, PAYNE & STRAWN, for appellant; EDWARD WARREN EVERETT, of counsel.

H. B. SPURLOCK, for appellees.

MR. JUSTICE BROWN delivered the opinion of the court.

This is an appeal from a judgment of the Circuit Court of Cook county, in favor of the appellees against the appellant for $386. The facts are simple and almost undisputed.

The appellees were produce and fruit commission men doing business on South Water street in Chicago. During the apple season of the year 1899, and for eight years previous, they shipped several cars of apples a day into Chicago from outside points. They had warehouses at different places in Michigan where they bought fruit and from which they shipped it into Chicago. One was at Mears, a station on the Chicago and West Michigan Railway about 225 miles from Chicago by a rail route from Mears to New Buffalo by the Chicago & West Michigan Road, and from New Buffalo to Chicago by the Michigan Central Road.

There was competition for fruit freights from Michigan to Chicago between railroads running into Chicago. The appellees, as stated, were considerable shippers from Mears and other Michigan points to Chicago, and within a week or two of October 16, 1899, a solicitor of freight for the Michigan Central Railroad Company, previously known as such by the appellees, came to Mr. Jones, one of the partners, and complained that he had been informed by the agent of the Michigan Central at Allegan that the appellees were shipping

from Michigan via the Lake Shore Road instead of by way of the Michigan Central. He solicited the business for his road. Jones replied that the Michigan Central was a more convenient road for his goods to arrive by, because its delivery point was close by South Water street, but that the Chicago & West Michigan was not furnishing them cars. The agent asked, "If we can make some arrangements to furnish cars from here, can we have the traffic?" and received a favorable answer. He then announced his intention of taking the matter up, and from that date on the appellees found no trouble in getting cars from the West Michigan.

On Saturday, the 14th of October, 1899, the loading of Chicago & West Michigan car No. 1884 with winter apples for cold storage in Chicago began at Mears. A Mr. Post in the employ of appellees represented them in Mears, but the appellee Jones himself was in Mears and saw the loading of the car begun on Saturday. The packing was completed under Mr. Post's direction on Monday the 16th. The car was of the ordinary box construction, but as it was used for carrying fruit it had both wooden and screen doors. The purpose of equipping fruit cars with screen doors is to allow ventilation in weather which is warm enough to injure the fruit if it is enclosed in closed cars. In such case the wooden doors are run back and the screen doors put forward to take their place.

The fruit was packed in barrels and the barrels placed in tiers according to the approved methods of fruit packers, allowing ventilation around them. The apples were in excellent condition when placed in the car. The wooden doors of the car were not closed on Sunday, nor until after Mr. Post had finished the loading of the car and received a shipping receipt or bill of lading from the station agent of the Chicago & West Michigan Railway on Monday. Post then went back to the orchard in which he was packing apples, and the agent took charge of and sealed the car, evidently shutting the wooden doors. The temperature was then and there not above sixty degrees Fahrenheit. The car was dispatched by the railroad agent to New Buffalo en route to Chicago in

the regular course of business on Monday, October 16th, and the shipping receipt with a manifest describing the contents of the car was sent by mail by Mr. Post to Harville & Jones. They received it Wednesday, October 18th. It was dated at Mears, was from the Chicago & West Michigan Railway Company, and the note of destination was "Harville and Jones, Chicago, Ill., via M. C.," M. C. meaning Michigan Central. Mr. Jones took the receipt on that day, Wednesday the 18th, to the local freight office of the Michigan Central Railroad Company in Chicago, and interviewed the chief clerk about the car. By comparison of the testimony of this chief clerk, E. F. Tebbits, and that of James J. McGrath, the "reconsigning clerk" of the Michigan Central at the same office, it appears that at other seasons and in ordinary times the car, routed as it was, would have gone to the Michigan Central team tracks at the foot of South Water street and Randolph street in Chicago for delivery, but at that time, because, as McGrath testifies, "They were getting so many apples" (it being the height of the apple shipping season), and because "the apples that were coming in were being ordered all around the city to the different warehouses," it would have been held at the yards of the Michigan Central at Kensington, where the Belt Railroad connects with the Michigan Central, "until it was ordered some place," or until the lapse of several days cleared the team tracks at South Water street of the cars ahead, when it would have eventually been carried there. This car, however, was "ordered some place." Mr. Jones showed the chief clerk the receipt and was referred to the "car clerk," whom he told that he wanted that car delivered to Drucker's Cold Storage Warehouse. The clerk said "All right," but requested a written order to that effect, which Jones gave him. It read:

"Deliver car 1884 C. W. M. from Mears, Mich., consigned to Harville & Jones, to Drucker's Cold Storage, Canal and Lake, St. Paul R. R. Co.

"HARVILLE & JONES."

M. C. R. R. Co. v. Harville.

The clerk took the order and pasted it in a book of such orders.

Drucker's Cold Storage Warehouse was an establishment of which John Drucker was the proprietor, well known to the fruit trade and evidently to the railroads, as Drucker's Warehouse or Drucker's Cold Storage. Instructions to the Michigan Central for deliveries of similar shipments to Drucker's Cold Storage had often been given by Jones & Harville and the goods had been delivered at the proper place without any trouble or mistake.

Car 1884 on leaving Mears had nailed on the outside a card as follows:

"Chicago & West Michigan Railway.

"From Mears

"To Chicago, Ill.

"Via. M. C.

"Laden with apples.

"No. car C. W. M. 1884.

"Unload at——"

It arrived at New Buffalo and was transferred to the Michigan Central Road there early in the morning on October 18th and left there at 7:50 A. M. of that day. It arrived at the Kensington yards of the Michigan Central at 6:50 P. M. of the 18th. On the next day, Thursday, the 19th, Mr. Jones was called on the telephone by Mr. Tebbits and told that the billing was at the office and the car was in Kensington, and that Jones should send the freight charges.

A numbered check of Harville & Jones dated October 19, 1899, was at once sent to the order of the Michigan Central Railroad for $38.48 to pay said charges, and a receipted bill for the freight charges was afterward handed appellees by the collector of the railroad company. The receipted bill is not dated, but the check was probably received on Friday, October 20th, for the delivery order or instructions before described was stamped: "M. C. R. R.—Received Payment, Oct. 20, 1899. F. C. Nicholas, agent."

The car 1884 was delivered to the Belt Railway Saturday, October 21st, with a way billing which gave the destination

as "Drucker's Cold. Co." It appears by said billing, intro-
duced in evidence, that it was received at the Western Ave-
nue Transfer of the Chicago, Milwaukee & St. Paul Railway
Co., with a switch track of which railroad Drucker's was
connected, on Monday, October 23rd. The Michigan Cen-
tral Railroad reported to Harville & Jones in later corre-
spondence that they had notice at 8 P. M. Saturday, October
21st, that the Chicago, Milwaukee and St. Paul Railway
would not accept the car "on account of its not being con-
signed to a consignee whose name appeared on their switch-
ing tariff."

As 8 P. M., October 21st, was the exact time that the rec-
ords of the appellant, introduced by it, show that the car was
delivered to the Belt Railway, carded to the Chicago, Mil-
waukee and St. Paul Railroad, it is probable that this report
from the office of the Michigan Central Railroad Co. in De-
troit in their letter of Jan. 26, 1900, is a mistake.

A railroad clerk of the Chicago, Milwaukee & St. Paul,
introduced as a witness by and for the appellant, testified
that Drucker's Cold Storage Warehouse was located on their
line at Canal and Kinzie streets (it was in fact on Canal
and between Kinzie street and Lake street), but was desig-
nated, he thought, on the switching tariff as "the John
Drucker." He said, speaking of the way-bill shown him,
"There is a mistake there. Drucker Cold Co. is not on the
switching tariff. If it had come addressed to Drucker's Cold
Storage or John Drucker's Cold Storage, it would have
been received."

The car was returned to the Michigan Central by the
Belt Railway, undoubtedly at Kensington, on Tuesday, Oc-
tober 24th, at 6 P. M., and was from there sent to the team
tracks at the foot of South Water street in Chicago, arriving
there at 9:10 P. M. on the evening of Wednesday, the 25th.

In the meantime the weather had grown warmer. The
temperature in Chicago had risen. From October 18th up
to October 23rd, it had ranged between 52 degrees Fahren-
heit and 65. On October 23rd and 24th it was from 76 to
82 degrees. On the 25th it fell again to 56.

M. C. R. R. Co. v. Harville.

The appellees, not having heard from the car, became anxious about it and called on the chief clerk, Tebbits, for information.    Monday, the 23rd, Mr. Tebbits, in answer to the statement that the car was not at Drucker's and the question what had become of it, declared that he couldn't understand it; that the car had been delivered by the Michigan Central all right, and that he would take up the matter personally. On Wednesday the 25th, Mr. Jones was again notified that the car had not reached Drucker's.    He went again to Mr. Tebbits, and told him that on account of the warm weather he was afraid of the condition of the car.    Mr. Tebbits told him that he would ascertain by wire immediately where the car was.    On the following morning, Thursday the 26th, Mr. Tebbits telephoned Mr. Jones that "he had found out about the car," that it was on the track at the foot of South Water street.    On the same day Mr. Jones received a notice from the railroad company addressed to Harville & Jones, dated, Office and Depot Foot of South Water St., October 26, 1899, and stating that the car had arrived at that depot consigned to them.    Mr. Jones then went to the car on the tracks. He found it entirely closed, the wooden doors shut and sealed. The card before described as nailed on the car at Mears, stating that it was laden with apples, was still on it.    There was no ventilation in the car, and the temperature within it was found to be thirty or forty degrees warmer than on the outside.    The apples were found to be what is termed in the trade "scalded" and unfit for storage.    They had ceased to be valuable for the business of Harville & Jones, and as Harville & Jones were required, if they took the contents of the car, to sign an acknowledgment that such contents were in good order, they declined to do so.    Mr. Jones, however, had a further interview with Mr. Tebbitts, explaining to him the condition of the car, and giving to him in writing a refusal to receive it.    The railroad company then turned the apples over for sale to a commission man employed by it, who sold them to a Greek fruit pedler for about a hundred dollars.    The value of them in good condition was practically conceded to be equal to the judgment obtained by the

appellees.   The amount obtained by the railroad was sworn
to by their own witness as more than their value as found
in the car.   It was tendered to the appellees on condition
that they should sign a receipt in full of their claim, which
they refused to do, and brought the present suit against the
Chicago and West Michigan Railway Company, the Michi-
gan Central Railroad Company and the Chicago, Milwaukee
& St. Paul Railroad Company jointly.   The Chicago and
West Michigan Railway Company was never served and did
not appear.   Before the cause was called for trial an order
was entered on the motion of plaintiffs that all papers and
proceedings therein "be and the same are hereby" amended
by discontinuing as to the defendant the "Chicago, Mil-
waukee and St. Paul Railroad Company," and before the
jury retired another order in the same terms was entered as
to the defendant the Chicago and West Michigan Railway
Company.

The testimony of experts in handling and shipping apples
at the trial strongly tended to prove that apples in barrels
in a closed car without ventilation generate heat which
makes them sweat and raises the temperature of the car much
above that of the outside atmosphere.   This would be pre-
vented by ventilation.   It will take two or three days, how-
ever, for the air in the car when first closed to be super-
heated, and any injury to the fruit to begin after the dan-
ger is increased by a rise in the natural temperature outside.
There was evidence, therefore, from which the jury were jus-
tified in believing that the car arrived at New Buffalo, and
indeed at Kensington in Chicago, in good order.

The only portion of the above statement of facts concern-
ing which there was any serious dispute, was the date of the
delivery instructions given by Harville & Jones to the Michi-
gan Central.   It is claimed by appellant that these were
given on October 20th and not on October 18th, and it is
assumed in its argument that this was proven by the direct
testimony of its own witness and by the date of the payment
stamp on the receipt of charges on the order when presented
in evidence, coupled with the evidence offered by it that it

was its custom to demand and receive payment of the freight charges before accepting delivery instructions for a point in Chicago off its own shipping lines. The testimony of Jones, however, to the contrary is positive and is corroborated strongly, to our minds, by the date of the check given in payment. At all events the jury had evidence before them which gave them the right to find that the "delivery instructions" or "reconsigning order," as the defendant calls it, was given by Mr. Jones to the company on October 18th, and if necessary to sustain the verdict it must be so considered.

It was on these facts, therefore, that it is to be assumed that the appellees obtained their verdict and judgment.

The attack upon them made by the appellant corporation is based both on their being on the merits against the law and the evidence, and on technical grounds relating to the pleadings, which it is said rendered the evidence on which they were based inadmissible, and the judgment consequently erroneous.

On the merits the appellant claims that it fulfilled all its obligations, whether such obligations are viewed from the standpoint of an express contract or from its implied contract and common law duties as a carrier.

The language of the argument of counsel is: "What were the appellant's obligations? Wherein did it default? To carry the car of apples from New Buffalo to Chicago and place it in the usual manner on the track commonly used for unloading within a reasonable time. This was done. Appellees afterward ordered the car reconsigned and directed appellant, by a written order in the handwriting of one of the appellees, that it be delivered to Drucker's Cold Storage, Canal and Lake streets, St. Paul Railroad. The only means appellant had for this delivery was over the Belt Railway, and on the following day the car was delivered to the Belt Railway. * * * Appellant could not have acted differently in fulfilling its obligations toward this shipment."

With this view of the case we cannot agree. Aside from the statements, contrary to the facts concerning which there is no real dispute, that the car, by being placed in the yards

at Kensington, was "placed on the track commonly used for unloading within a reasonable time," and the statement, contrary to the facts that may properly have been found by the jury, that the car was on the day following the so-called "reconsigning order" delivered to the Belt Railway, the proposition entirely ignores considerations which we deem of great importance in the decision of this cause.

It ignores the fact that the evidence tends to show that the goods were received in good order by the appellant at New Buffalo, with notice on the car of what it contained, and with means in the car of securing ventilation if delay in delivery rendered it necessary.

It ignores the fact that the congestion of fruit cars and the manner in which a shipment of apples was about that time generally treated by the consignees caused the appellant to keep the car at Kensington awaiting delivery orders, instead of sending it on at once to the team tracks at the foot of South Water street near the consignees' place of business.

It ignores the fact that it was three full days after the arrival at Kensington before the car was moved at all.

It ignores the fact that after it was refused by the Chicago, Milwaukee & St. Paul Railroad, on the ground that its noted destination was not on its switching tariff, the appellant neither took any steps on its own account, although its attention through proper channels had been called to the delay in the car's reaching its destination, to ascertain and remedy the miscarriage, nor notified the consignees until at least two days afterward; while during all that time it did nothing to secure ventilation in the car.

It above all ignores the fact that according to the testimony of its own witness, Erwin, what in railroad phrase is called "the bulling of the billing" by the appellant itself, by which the destination of the car was changed from "Drucker's Cold Storage, Canal and Lake," to "Drucker's Cold Co.," was alone responsible for the refusal of the Chicago, Milwaukee & St. Paul R. R. Company to accept it.

Under circumstances like these, such cases as are cited by appellant to the point that "the liability of a carrier *as a*

*common carrier of freight* ceases upon the *unloading* of the goods from the car at the place of destination *and placing them in a safe and secure warehouse,* or where the carrier is not required in the usual course of business, or expected as in the case of *grain in bulk, coal, lumber, and the like,* by delivering the car in a safe and convenient position for unloading at the elevator, warehouse, or other place designated by the contract, *or required in the usual course of business,* or if no place of delivery is thus designated or required, *on its side track in the usual and customary place for unloading by consignees"* (Gregg v. I. C. R. R. Co., 147 Ill., 550), are not in point.

Nor is a case in point which decides that carrying safely to destination consigned freight and placing it in a safe warehouse, without notice to the consignee, changes the liability of the common carrier from that of an insurer to that of a warehouseman or bailee for hire.    I. C. C. R. Co. v. Carter, 165 Ill., 570.

There is no authority which holds that on refusal of freight by a consignee, or non-delivery through other obstacles, notice is not required to the consignor or persons known by the carrier to be owners or interested in the goods. The law is the other way.    Louisville & Nashville R. R. Co. v. Duncan, 137 Alabama, 446.

Nor is there any authority which relieves a carrier from liability who "bulls the billing," or who fails to take en route reasonable and proper care of the freight dependent in its nature on the circumstances of the particular case.    Nor does it seem reasonable to our mind that no further steps ought to have been taken in this case by the appellants to secure the delivery of the apples at a place proven to have been necessarily so well known to it as Drucker's Cold Storage Warehouse.

On the merits of the case the jury and the trial court were entirely justified in their conclusions.

The argument of the appellant most earnestly insisted on, however, is based upon technical grounds relating to the pleadings.    It is insisted that the proof was at variance with

the allegations of the declaration and should not therefore
have been admitted on the trial, and that the statute of limi-
tations as pleaded was in any event a good defense, as the
evidence if admissible at all was admissible only after the
declaration was amended on April 19, 1906, more than five
years after the occurrences which were the subject of the
suit.    It is said that the amendments, if they had any
effect at all, introduced a new cause of action.

We are unable to assent to the elaborate argument of ap-
pellant on these propositions.

It is urged that as the form of action in assumpsit, rather
than *ex delicto* was chosen, and the suit was begun against
three railroad corporations jointly, the proof must conform
to the allegation and show that all three corporations jointly
undertook the contract of safe carriage from Mears to Chi-
cago described in the original declaration, or there is a fatal
variance.    It is said, moreover, that the declaration counts
upon a special and express contract, which it was proven
was made at Mears by the Chicago & West Michigan Rail-
way Company and not by the appellant, while any contract
which the evidence tends to prove to have been made by ap-
pellant was the entirely different implied contract made by
the reception of the freight at New Buffalo for carriage to
Chicago.

The appellees assent to the statement that the proof is of
an implied contract arising from the acceptance of the goods,
but dispute the proposition that after the various amend-
ments of the declaration the allegations of the various counts,
and especially of the second count of the original declaration
as amended and of the first and second additional counts,
are inconsistent with that proof.    We agree with appellees
in this.

Assuming that which is not entirely free from doubt in
our minds, that the solicitation of this business by the appel-
lant to come by the way of the West Michigan road to the
Michigan Central was of no significance whatever in de-
termining the obligations of the latter in respect to the
through carriage, the argument of appellant leaves out of

account the effect upon the declaration of the amendments of June 29, 1906, and of July 3, 1906, discontinuing against the two other defendants respectively. The claim is made by appellant that leave only to amend was given and no amendment made, and it cites C. B. & Q. R. R. Co. v. John Suta, 123 Ill. App., 125, and Wisconsin Central R. R. Co. v. Wieczorek, 151 Ill., 579, to the point that leave to amend is not the same as an amendment. These cases state the law correctly undoubtedly, but they are not applicable. In this case the language of the respective orders is "that all papers and proceedings herein *be* and the same *are hereby* amended by discontinuing," etc. After the last of these amendments the declaration was against the Michigan Central Railroad Company alone, and the word defendant*s* wherever it appeared in it must be considered as reading defendan*t,* and the word defendan*t,* referring to any other company than the Michigan Central, dropped.

But by an amendment of April 19, 1906, the second count of the original declaration had already been amended so as to make the contract of carriage and delivery therein alleged to be from New Buffalo to Chicago. Under this count alone, as thus three times amended, the proof was competent and admissible.

Three additional counts were also added to the declaration on April 19, 1906. An analysis of them will show that although after the subsequent amendments they stated a contract of carriage by the Michigan Central Railroad Company from Mears to New Buffalo, which was not substantiated by the proofs, they also expressly and categorically stated a contract on the part of that company to carry the same goods from New Buffalo to Chicago, which was so substantiated, and that in two of these additional counts it was this last mentioned contract only which they alleged was broken to the damage of the plaintiffs. The third of the additional counts alleging the breach of both contracts may have been bad for duplicity, but if so, that defect could only have been reached by special demurrer. We think that under all or

any of these four counts described the evidence was admissible and properly received.

It is further urged by the appellant, however, as before indicated, that the Statute of Limitations was a good defense to these counts because they introduced a new cause of action. I. C. R. R. v. Cobb, Christy & Co., 64 Ill., 128, is quoted to sustain this contention. It was in that case said that amendments introducing "shipments by different persons from different places and at different times from those described in the original declaration," set up entirely new causes of action. We think it only necessary to say in regard to this contention that we do not consider these amendments as doing any such thing. In the words of the Supreme Court of Alabama in Alabama Great Southern Railroad Company v. Thomas, 89 Ala., 294 (a case cited with approval in Chicago City Railway v. McMeen, 206 Ill., 108), "The identity of the matter on which the suit is founded is fully preserved. The amendments all fall within the *lis pendens* proper, and only subserve the purpose of accomplishing substantial justice between the parties and of deciding the pending controversy on its real and true merits."

Moreover, if the matter is to be viewed with extreme technicality, rather than upon its substantial merits, we can but assent to appellee's view that the plea of the statute filed by the appellant was by its terms a plea to the whole declaration. The "amended declaration and the additional counts" referred to in it must be held to mean the whole original declaration, although one count of it only was amended at the time the plea was filed. Thus considered the plea was plainly not sustained. The issue tendered by it was as to the relation in time of the occurrences sued on to the filing of the original declaration. It is not, however, necessary to rest the decision of this case on this technical answer to a technical defense. There was no one misled or deceived as to the identity of the negligence or breach of contract complained of by the alteration or addition to the declaration. Substantial justice has been done.

There are various rulings on the admission of evidence by

the trial court which are complained of. Many of them have been disposed of by our decision on the alleged variance; the others are in any event immaterial and would not constitute reversible error if they were incorrect. But a consideration of them in detail has convinced us of their general accuracy. The complaint that the plaintiff Jones was allowed to state the contents of a telegram from the Michigan Central agent at Allegan to the soliciting agent of the Road in Chicago, is unfounded. The testimony was merely of a conversation with the Chicago agent.

The original shipping receipt and other matters of the history of the shipment which collaterally threw light upon the character of the contract of safe carriage and delivery implied from the defendant's reception of the goods at New Buffalo, and its default therein, were competent, material and admissible. If the manifest sent by Post with the receipt were an exception to this, it was harmless. So was the expert testimony competent and admissible which tended to prove the good condition of the apples when received at New Buffalo when coupled with the testimony which showed their condition when shipped at Mears.

The objection to the three freight bills identified by the witness Fearon ignores the testimony of Erwin that it was because the way-bills to the Chicago, Milwaukee & St. Paul did *not* follow the directions given by the appellees, which were the same as in the freight bills identified, that the goods were refused. They tended to confirm Erwin's testimony.

The complaint of the refusal to receive the cash book of the appellant in evidence is based on an apparent misconception. There was no claim by appellees that the payment of freight charges was made on October 18th. On the contrary the check dated October 19th was introduced, and it was not disputed that it was received and credited the next day. The evidence was useless, and the error in excluding it harmless, if it was error. There was no issue made on the fact sought to be proved. It was the date the order was received, not the date the payment was made, that was disputed.

17

The giving of the instructions given and the refusal of those refused are also assigned for error. We have considered them all and find that the jury were thoroughly instructed as to the law and as favorably for the defendant as was consistent with accuracy. The instructions refused were incorrect or misleading as applied to the circumstances of this case.

We find no reversible error in the proceedings or the judgment. The judgment is therefore affirmed.

*Affirmed.*