*In re* Petitions of PETERSEN and others *v.* CASE, Receiver, etc.

(*Circuit Court, E. D. Wisconsin.* October 16, 1884.)

1. COMMON CARRIER—DELIVERY OF GOODS TO CONNECTING LINE—LIABILITY OF FIRST CARRIER.

When goods are to be delivered by a railroad company to a second line of conveyance for transportation further on, the common-law liability of common carriers remains on the first carrier until he has delivered the goods for transportation to the next one Its obligation while the goods are in its depot does not become that of a warehouseman.

2. SAME—BLOCK IN FREIGHT—DAMAGES CAUSED BY DELAY.

Where, while goods received by the first carrier are in transit, the connecting line notifies it that it cannot receive the goods and transport them to their destination because of a block in freight, this will not relieve the first carrier from liability for damages caused by the delay, where it fails to notify the shipper and give him an opportunity to dispose of the property or take measures for its preservation.

3. SAME—MEASURE OF DAMAGES.

The measure of damages in such a case is the difference between the market value of the goods at the place of destination when they ought to have been delivered and their market value when they were delivered.

At Law.

*G. W. Cate, A. J. Smith,* and *W. J. Turner,* for petitioners.

*Theodore G. Case* and *W. C. Larned,* for receiver.

DYER, J. In the foreclosure of a mortgage on the Green Bay & Minnesota Railroad, in this court, the respondent was appointed receiver, and as such was empowered to operate the road pending the receivership. In October, 1881, he was so operating the road, the eastern terminus of which was Ft. Howard, where there existed connections with the Chicago & Northwestern Railway for the transportation of freight shipped on the receiver's line of road, and destined for Chicago. On the third day of October, 1881, the petitioner Petersen shipped over the respondent's road, at Amherst Junction, Wisconsin, two car-loads of potatoes consigned to a commission house in Chicago. On the fifth day of the same month he shipped from the same place, over the same line of road, two other car-loads of potatoes, consigned to the same parties as were the first. On the third day of the same month the petitioners Allington & Co. also shipped over the receiver's line of road, at Amherst Junction, one car-load of potatoes, consigned to a commission firm in Chicago. The course of transit was over the Green Bay & Minnesota road, from Amherst Junction to Ft. Howard, thence, via the Chicago & Northwestern Railway, to Chicago.

In the *Petersen Cases* bills of lading were issued to the shipper, wherein it was stated that the potatoes were received "in apparent good order by the receiver of the Green Bay & Minnesota Railroad, * * * to be transported over the line of this railroad to Chicago, and delivered after payment of freight, in like good order, to a company or carrier, (if the same are to be forwarded beyond the lines of

this railroad,) to be carried to the place of destination; it being expressly agreed that the responsibility of the receiver shall cease at his depot, at which the same are to be delivered to such carrier." The bills of lading also contained this further clause: "It is further especially agreed that, for all loss or damage occurring in the transit of said packages, the legal remedy shall be against the particular carrier or forwarder only in whose custody the said packages may actually be at the time of the happening thereof; it being understood that the receiver of the Green Bay & Minnesota Railroad assumes no other responsibility for their safe carriage or safety than may be incurred on his own road." The bill of lading in the case of Allington & Co. was like those issued on the Petersen shipments, except that it was therein stated that the property was to be carried over the Green Bay & Minnesota road to Green Bay, "and delivered, after payment of freight, in like good order, to C. & N. W., * * * to be carried to the place of destination." This difference in the terms of the bills of lading is not material, because it must have been the understanding of the parties that the carriage of the property over the line of the Green Bay & Minnesota road terminated at Ft. Howard, and that it was to be there delivered by the receiver to the Chicago & Northwestern Railway for transportation to Chicago.

It appears from the proofs that the potatoes shipped at Amherst Junction on the third of October, reached Ft. Howard at 5 o'clock P. M. of that day; that of the shipments of October 5th, one arrived at Ft. Howard at 5 P. M. of that day, and the other at the same time of day on the 6th; and the evidence shows that within 24 hours after the arrival at Ft. Howard of each of these shipments, a freight train left that place for Chicago on the Chicago & Northwestern road. The precise character of the running connections between the two roads at Ft. Howard is not shown; but it is evident that there was a business arrangement between them by which freight brought to Ft. Howard over the Green Bay & Minnesota road, and consigned to points south and east, was transferred to the Chicago & Northwestern road, and forwarded to its destination; and that the cars of the former road, containing bulk freight brought from points inland, were run upon the track of the latter road at Ft. Howard, without breaking bulk, and were put into the trains of the Chicago & Northwestern Company, and taken through to points on its road to which the freight was consigned. It is shown that at Ft. Howard there was a Y track connecting the Green Bay & Minnesota road with the Chicago & Northwestern, and by the course of business, cars from points on the former road, containing freight destined south, were switched from the respondent's yard tracks, by his employes, to the Y track, and were there taken by the employes of the Chicago & Northwestern Company and placed in the trains of that company; so that delivery of such cars to the latter company was accomplished when they were placed on the Y.

It appears from the testimony that from about the third to the tenth of October, 1881, there was a freight blockade at Chicago, which it is claimed rendered it impossible for the Chicago & Northwestern and certain other railroad companies to promptly deliver certain kinds of freight to consignees in Chicago. This blockade was occasioned by the inability of roads running east to take away the cars containing through freight destined east, as fast as they arrived on roads running north and west; by reason of which state of things there was an accumulation of cars containing through freight bound east, which prevented the handling of cars constantly arriving, containing freight to be delivered to Chicago consignees. In consequence of this pressure of freight, the Chicago & Northwestern Company, on the fifth day of October, requested the respondent to stop shipments of potatoes and barley in bulk from points on his line to Chicago until the 12th, and all agents at stations on the respondent's road were immediately instructed to refuse such shipments. It would seem that the respondent did not receive notice of the Chicago blockade, and, consequently, did not notify his agents until after the cars containing the potatoes here in question had left Amherst Junction, and were either in transit to or had arrived at Ft. Howard. Having arrived at that point, the agent there in charge—who was the joint agent of the two roads—was instructed not to place the cars on the Y for delivery to the Chicago & Northwestern Company until October 10th. Accordingly, these cars, with their contents, remained in the respondent's yards until that day, when they were delivered to the Chicago & Northwestern Company, and reached their destination on the eleventh or twelfth of the month. On delivery to the consignees, the potatoes in all the cars were found to be so seriously decayed that a large loss was sustained in the sale of them; and this loss, which the petitioners attribute to delay in their transportation, they seek to recover from the respondent.

In resisting the petitioners' demands, the respondent claims that the potatoes were unsound when they were shipped at Amherst Junction, and there is considerable testimony bearing upon this issue of fact. It is unnecessary to discuss this testimony in detail. The bills of lading issued by the respondent state that the potatoes were received for transportation in apparent good order, and on the part of the petitioners it is shown that the potatoes were loaded from wagons into the cars as received; that they were examined and assorted with care; and that when shipped they were in sound merchantable condition. This is very positively sworn to by the shippers, and by various witnesses who handled the potatoes. It is also in proof that other potatoes shipped to Chicago at about that time, and which were transported in the usual time over another line of road, arrived in good merchantable condition. On the part of the respondent it is shown that the season of 1881, in consequence of continued wet weather through the month of September, was an extremely unfavor-

able one for the shipment of potatoes. Some of the witnesses testify that they sustained heavy losses from decay of potatoes shipped from points near Amherst Junction to Chicago which were not delayed in transit, but none of them purchased and shipped potatoes at Amherst Junction, nor did they see the potatoes which the petitioners shipped. Experts testify that potatoes which were dug before they were fully ripe, and freshly shipped, in the state of weather then prevailing, were extremely liable to develop unsoundness, and that this could not be prevented by the utmost dispatch in transportation. They also express the opinion that if the potatoes in question were sound when shipped they would have sustained no injury by the delay proven in this case. In considering this testimony my mind has not been free from doubt upon the question of fact in dispute, and it must be admitted that the respondent's contention is not without support, if the testimony which he adduces is entitled to weight. In short, if the opinions of experts, and the experience of other shippers, and the testimony which tends to show that the potato crop of 1881, in northern Wisconsin, was exceptionally liable to disease, are to prevail against the positive testimony of the petitioners, and of witnesses who handled these potatoes, and the fact that other potatoes shipped from the same locality and transported with usual dispatch arrived in Chicago in merchantable condition, then the conclusion must be that the loss sustained by the petitioners is attributable to unsoundness of the potatoes when they were shipped. But giving to the evidence adduced by both parties its due weight, one side being supported by positive assertions of fact founded upon personal observation and knowledge, and the other by opinions and conclusions deduced from a general state of facts perhaps not applicable to the particular case, the court, in the exercise of a judicial judgment, must conclude that the fact in dispute is as proven by the petitioners. The evidence on their part is positive; that on the part of the respondent is in its nature negative, based rather on supposition and conjecture than on knowledge of the facts in the particular case.

So, too, upon the evidence before the court, the conclusion must be that the injury to the potatoes resulted from the delay in their transportation. Each car contained between 400 and 500 bushels. The weather at the time, in the language of the witnesses, was warm, damp, and muggy. The potatoes may not have been, strictly speaking, perishable property, according to the ordinary classification of railroad freight. But the season was such that delay in their transportation was hazardous. The proofs show that from the third to the eleventh of October the temperature at Ft. Howard ranged at midday from 50 degrees to 76 degrees above zero. It appears that the three car-loads shipped on the 3d, and which were consequently longest delayed, were most seriously injured, and one of these is described as steaming with heat and decay on arrival in Chicago. This was a car containing 470 bushels, then worth if in sound condi-

tion one dollar per bushel, but for which the petitioners Allington & Co. realized only $69. The testimony tends to show that the process of decay, once begun, would rapidly go on, where, in such weather, potatoes in such quantities were confined in a close box car of ordinary construction, in which there were not free circulation of air and opportunity for the moisture to evaporate. Taking the evidence as it stands, I must hold that the petitioners proved, at least *prima facie*, the soundness of the potatoes when shipped. The burden of showing that they were not sound then fell upon the respondent, and this he has not shown by such testimony as outweighs that of the petitioners and their witnesses. It need only be added in this connection that if the original injury was attributable to the fault of the respondent, then he is legally chargeable, as between him and the petitioners, with the continuing consequences of that fault; namely, the loss resulting from the continued decay of the potatoes while in the whole course of transit to Chicago.

The question of legal liability upon the facts as proven, remains to be considered. The learned counsel for the respondent argued at some length, and cited many authorities upon the point, that, as a common carrier, he was not liable for any negligence or delay in transportation occurring on the connecting carrier's line. Admitting this to be so, it does not appear that the point is a material one in the case. The respondent was under obligation to safely deliver the potatoes to the next carrier in the line in as good order as when received. As we have seen, according to the course of business between the two carriers, delivery of such freight was made by placing the cars on the Y at Ft. Howard, where they were taken away by the Chicago & Northwestern Company. Until the cars containing these potatoes were thus delivered, they remained in the possession of the respondent, and his common-law liability as a carrier continued until such delivery. The law on this subject was settled in *Railroad Co.* v. *Manufacturing Co.* 16 Wall 318, where it was held that when goods are delivered to a common carrier, to be transported over his railroad to his depot, in a place named, and there to be delivered to a second line of conveyance for transportation further on, the common-law liability of common carriers remains on the first carrier until he has delivered the goods for transportation to the next one. His obligation while the goods are in his depot does not become that of a warehouseman. While, therefore, these cars of potatoes were in the possession of the respondent at his depot in Ft. Howard, they were, in the eye of the law, still in transit, and the liability of the respondent therefor, continued unbroken, except as such liability may have been limited by the bills of lading, until they were actually delivered to the next carrier in the line. *Railroad Co.* v. *Mitchell*, 68 Ill. 471; *Conkey* v. *Railroad Co.* 31 Wis. 619. The clause in the bills of lading that the responsibility of the receiver should cease at his depot, must be read in connection with the other provisions of the contract.

That clause did not qualify the obligation of the respondent to deliver the freight to the Chicago & Northwestern Company, and to deliver it in as good order as when received. It was at the depot, or presumably within the depot limits, that such delivery was to be made; that is, on the Y track connecting the two lines, and used for that purpose.

The respondent's general liability being as heretofore stated, was his failure to promptly deliver this freight to the Chicago & Northwestern Company excused by the refusal of that company to take it in consequence of the blockade at Chicago, and what duty, if any, in view of the action of that company, did the respondent owe to the petitioners? It is to be observed that the notice of the Chicago & Northwestern Company to the respondent that it would not receive further shipments of potatoes and barley from his road until October 10th, was not given until after the petitioners' property was in transit. The first carrier was then in possession of the property, exercising control over it, as a common carrier. It may be doubtful whether the evidence shows such an inability to deliver freight to Chicago consignees at that time as would excuse the last carrier from the obligation to complete the transportation of freight which had been previously received by the first carrier and was then actually in transit. But I take it that is exclusively a question between the two carriers, and with which the petitioners have no concern. If the refusal of the Chicago & Northwestern Company to receive this freight from the respondent was a violation of any business arrangement between the two carriers,—a question not arising here,—that might raise a controversy between them, but it would concern them alone, and the rights of the petitioners ought not to be affected thereby. I do not forget the case of *Helliwell* v. *Railway Co.* 10 Biss. 170, in which this court held that if at the time of making a contract for shipment of freight the carrier has no doubt, and if the condition of business on its lines gives it no ground for doubting, that suitable means will be at its command within the usual and ordinary time for conveying the freight, and if all reasonable efforts are seasonably employed to obtain such means, and the delay is solely occasioned by an extraordinary influx of freight upon its lines arising subsequently to the making of the contract, the carrier will not be held responsible for the delay. But this presupposes that there was no negligence on the part of the carrier. And here we touch the point upon which, in its legal aspect, these cases turn. Conceding that the inability of the respondent to forward the potatoes from Ft. Howard was attributable to causes which he could not control, it then became his duty to use all reasonable means to preserve the property from loss, and to that end he should have notified the shippers that the property could not be forwarded, thereby enabling them to otherwise dispose of the property, or to take measures for its preservation. If the potatoes when shipped were not, in a strict sense, perishable

property, it is evident they became such while in the respondent's custody. He knew on the fifth of October that they could not be forwarded before the 10th, and would not in due course reach their destination before the 11th or 12th. The petitioners were shippers at a point not remote on his line of road, and it was not difficult to notify them of the situation of their property. I think it was his duty, as the custodian of the property, to give them such notice, and thus enable them to protect themselves, as far as possible, against loss.

In *Conkey* v. *Railway Co.* 31 Wis. 637, Mr. Chief Justice Dixon was of the opinion that in the case of an interruption of transportation from extraordinary causes, rendering it impossible to send merchandise forward, the carrier might store the property, and at once give notice to the owner, and thus absolve himself from liability as a carrier. It is not claimed that any notice was given to the petitioner Petersen. The station agent testifies that he told the petitioner Allington, on the seventh of October, that the potatoes were then at Green Bay, and requested him to inform Petersen. But Allington unqualifiedly denies this. The petitioners Petersen and Een swear that they had no information as to the whereabouts of the potatoes, and there is no proof to the contrary. Another witness, not a party to these cases, testifies that on the twelfth of October he was at the Amherst Junction station with Allington, Petersen, and one Couch, who had something to do with the shipments; that Couch asked the station agent if he knew or could tell where the cars of potatoes were, and that he answered he could not. The station agent himself testifies that he first heard that the cars were at Ft. Howard on the 7th, which was four days after part of the potatoes had been shipped from Amherst Junction, and there is evidence that one of the petitioners called on the agent almost daily for information about the potatoes, but got none. There is no proof that anything was done with the potatoes at Ft. Howard, except to leave them as they were shipped, in the car on the side track; and deciding this question, as I must, upon the preponderance of testimony, I am obliged to hold that notice to the shippers of the delay and situation of the property is not proven, and therefore that the respondent held the potatoes during the period of delay subject to the common-law liability of a common carrier.

The measure of damages in these cases, is the difference between the market value of the potatoes in Chicago when they ought to have been delivered, and their market value when they were delivered. Under this rule of damages, the petitioners, upon the testimony, are entitled to recover the amounts claimed by them in their petitions; and orders will be entered requiring the respondent to pay to the petitioner Petersen the sum of $863.63, and to the petitioners Allington & Co. the sum of $367.70.