Brennan Packing Company, Defendant in Error, v. Andrew W. Mellon, Director General of Railroads and Agent, Plaintiff in Error.

Gen. No. 32,883.

Opinion filed April 30, 1929.

FOLLANSBEE, SHOREY & SCHUPP, for plaintiff in error; MITCHELL D. FOLLANSBEE, CLYDE E. SHOREY and JOHN E. GAVIN, of counsel.

KELLY & MURPHY, for defendant in error.

Mr. Justice Scanlan delivered the opinion of the court.

In the superior court of Cook county, Brennan Packing Company, a corporation, plaintiff, sued Andrew W. Mellon, Director General of Railroads and Agent, defendant, in an action of trespass on the case on promises. The defendant was operating Erie Railroad. There was a trial before the court, without a jury, and at the conclusion of the evidence the issues were found for the plaintiff and its damages were assessed at $13,958.60. Judgment was entered on the finding and this writ of error followed.

Two carloads of "sweet pickled picnic hams" were shipped by the plaintiff from Chicago, Illinois, over Erie Railroad, in July, 1919. The defendant then knew that the shipments consisted of perishable foodstuff. When the meat was received by the defendant, it issued and delivered certain bills of lading to the plaintiff, but as the shipments were intended for export, the plaintiff indorsed and surrendered to the defendant the said bills of lading and requested, in writing, export bills of lading. In the written request the plaintiff directed that the consignee be shown as "To order of Brennan Packing Co. Antwerp, Belgium Notify Palmer and Peeters Antwerp, Belgium . . . Oceanvia— Triangle S. S. Corp. . . . Overseas Shipping Co." Thereupon, "in lieu of said original bills of lading," the defendant issued, as it was required to do by the Interstate Commerce Act, and the rules and regulations adopted in furtherance thereof, four through bills of lading, two for each shipment. The said bills recite the receipt, in Chicago, Illinois, by the defendant, of the property in question, "marked, numbered, consigned and destined," as follows: "Consignee and Destination Order Brennan Packing Co. Antwerp Belgium Party to be Notified Palmier & Peeters Antwerp Belgium . . . To be carried to the Port (A) of New York and thence by Triangle S. S.

Corp. to the Port (B) Antwerp . . . and to be there delivered in like good order and condition as above consigned. . . .'' The bills provide that in consideration of the rate of freight named it is understood that the service to be performed shall be subject to the conditions contained in them. They are signed, ''C. D. Turner, Agent, On behalf of carriers severally, but not jointly.'' The first carload of the shipment left Chicago over the defendant railroad July 18 and arrived at Croxton, New Jersey, ''the terminal yards of the defendant,'' July 22, 1919. It was iced by the plaintiff at Chicago, and by the defendant, at plaintiff's expense, at Hornell, New York, on July 21. The second carload left Chicago July 19 and arrived at Croxton July 23. It was iced in the same way as the first car. This icing was sufficient refrigeration to carry the shipments in good condition from Chicago to Croxton. Neither of the two carloads was iced or ''refrigerated'' after it left Hornell, New York. On July 24, 1919, copies of the bills of lading and a copy of plaintiff's export declaration were delivered to the Triangle Steamship Company by the defendant. On July 25, 1919, the defendant received from the Steamship Company ''a permit to deliver said shipment to Triangle Steamship Company, Steamship 'Lake Berden' at pier No. 74 North River, New York, New York, for delivery on to-wit: July 28th, 1919.'' On the last mentioned date defendant's employees removed the meat from the two cars at Croxton and loaded it upon a lighter, owned and controlled by the defendant, which proceeded, on the same day, to pier No. 74, North River, New York City, where the defendant made a tender of the shipments to the Steamship Company. That company ''failed to receive the shipments'' and directed the captain of the lighter ''to hold said shipment on said lighter awaiting receipt,'' and the lighter, with the shipments aboard, remained at said pier until August 6, 1919. The shipments were neither iced nor

refrigerated during the time they remained on the lighter. It is stipulated that they "were delivered to the Triangle Steamship Company on August 6th." The delivery took place at the latter's "Loading Berth, Pier 74 New York," and the Steamship Company gave to the defendant its "dock receipt" for the shipments. The shipments remained on the dock, and were condemned and destroyed, as the meat had become unfit for human consumption. It was stipulated that "no notification was at any time given to plaintiff by defendant of the failure of Triangle Steamship Company at any time to accept said shipment, and no notice was ever given to plaintiff by the defendant at any time that said shipment was delivered by the defendant to the Triangle Steamship Company on August 6th, 1919," and it further appears that no notice of any kind was given by the defendant to the plaintiff of the fact that the meat was being held on a lighter in the North River and without icing or refrigeration. Other facts, material to the decision of this case, are hereafter stated in this opinion. The case was tried for the most part upon a stipulation of facts, which established the incidents of shipment, the terms of the contract, the transportation to New York City and occurrences there, as well as the value of the shipments and the fact that they never reached Antwerp, Belgium, and that plaintiff received nothing of value for them. Certain oral and documentary testimony was also offered on the trial.

The defendant, in its brief, argues the following contention only: "The contract of carriage, so far as defendant was concerned, bound the defendant to carry the goods safely to the port of New York and there hold them for delivery on the order of the Triangle Steamship Company. It was not a through carriage contract, by its terms the Carmack Amendment to the Interstate Commerce Act not applying," and therefore "limitations of liability by bill of lading was proper."

From the very short argument in its brief it is difficult to understand the exact position of the defendant as to this contention. In fact, the defendant states that "as it is the intention of the plaintiff in error . . . to argue this case orally, the matter set up under this heading will be brief." However, the position of the defendant, as stated in its oral argument, is plain. In that argument counsel call attention to the following provision in paragraph 3 of part I of "Conditions" in the bill of lading: "No carrier shall be liable for loss or damage not occurring on its own road or its portion of the through route, *nor after said property is ready for delivery to the next carrier or to consignee;*" (italics ours) and also to the following provision in paragraph 5 of part I: "Property not removed by the person or party entitled to receive it within twenty-four hours after its arrival at destination (Port A), may be kept in the car, depot or place of delivery of the carrier, at the sole risk of the owner of said property," and they contend that "these provisions fit the facts of this case and exempt it from liability," and argue that when the defendant tendered the meat to the Triangle Steamship Company at New York (Port A) on July 28, 1919, "its liability terminated," under the contract, and its duty to the plaintiff ceased, and that even though the meat was thereafter damaged by the negligence of the defendant the latter is not thereby responsible to the plaintiff, and it must look to the Steamship Company for compensation for the damages it has sustained.

It may be conceded, at the outset, that the defendant, under the bills of lading and the law, would not be responsible for any negligence of the Steamship Company after the shipments had been delivered by the defendant to that company.

In our judgment, under the facts and the law of this case, the defendant was acting as a common carrier until the delivery of the meat to the Steamship Com-

pany. Under the Interstate Commerce Act, and the rules and regulations adopted in furtherance of it, the defendant was required to issue to the plaintiff, on its written request, the through bills of lading, and under the said act and the bills of lading it was required to deliver the shipments to the Steamship Company. The lighter on which the meat was loaded from the defendant's cars on July 28 was the property of the defendant and under its sole control, and it was a part of its system as a common carrier and it was its medium of delivering an export shipment to the "next carrier"— an ocean steamship line. The meat remained on this lighter from July 28 until August 6, 1919. From the time it was delivered to the defendant on July 18 and 19, 1919, until August 6, 1919, at which time it was rotten and unfit for human consumption, it was in the sole custody and control of the defendant, and it is stipulated that the defendant did not make delivery to the Steamship Company until August 6, and there is nothing in the evidence to indicate an intention on the part of the defendant to renounce the capacity of a carrier after July 28, 1919, and, furthermore, there is nothing in the proof to indicate that the defendant did not acquiesce in the delay which intervened between the time of the tender of the meat to the Steamship Company and the time of its actual delivery to that company. There is no evidence that the defendant made any protest to the Steamship Company in reference to its delay in accepting the meat, and the defendant was apparently willing to deliver it at the convenience of the Steamship Company. Paragraph 11 of part I of "Conditions" in the bill of lading provides for "the delivery of the said property to the steamer, her master, agent or servants, *or to the steamship company, or on the steamer pier at the said port.*" (Italics ours.) On August 6 the defendant delivered the shipments to the Steamship Company on the latter's "steamer pier at the said port." The lighter re-

mained at this pier for nine days, with the shipments aboard, when the defendant had the right, under the bill of lading, to deliver the shipments on this pier on July 28. We note that paragraph 10 provides that while a shipment awaits further conveyance the carrier's liability shall be that of a warehouseman, but we are of the opinion that, under the particular facts of this case, the defendant is precluded, by its conduct, from now claiming that it ceased to be a common carrier after the tender to the Steamship Company on July 28. (See *Texas & Pacific Ry. Co. v. Clayton*, 173 U. S. 348, 362, 363.) In any event, the defense of the defendant is not and could not be based upon paragraph 10. The shipments in the instant case had not arrived at their destination at the time in question, and therefore paragraph 10 would apparently not apply to a case like the present one, but, if it did, it is the rule in the federal court that where an interstate shipment has arrived at its destination, and where there is a stipulation in a bill of lading that the carrier shall be liable, as a warehouseman only, for goods after arrival at destination and not removed within a specified time, the carrier is liable for its negligence as a warehouseman. (*Southern Ry. Co. v. Prescott*, 240 U. S. 632.)

But even if it be assumed that the liability of the defendant as a common carrier ceased on July 28, 1919, and entirely aside from the fact that the defendant would be liable for negligence, if its status after July 28 be considered as that of a warehouseman, nevertheless, unless the defendant is correct in its contention that the said provisions in paragraphs 3 and 5 legally exempt it from all liability, a duty still rested upon it to exercise reasonable care and diligence to prevent unnecessary damage to the meat. If the defendant be considered merely as a forwarder to the next *designated* carrier, the Steamship Company, it would be required, in that capacity, to exercise the

same degree of care to prevent damage that a prudent owner would in the same situation. It is a general rule that where the carrier is unable to deliver the goods to the next designated carrier, it is his duty to at once notify the shipper or consignee, if he has an opportunity to do so, and a failure to give such notice will render him liable for any loss or injury resulting therefrom. (*Fisher v. Boston & M. R. Co.*, 99 Me. 338, 59 Atl. 532.) That case cites a number of decisions in support of its ruling. In *Johnson v. New York Cent. R. Co.*, 33 N. Y. 610, 611, the Railroad Company undertook to transport flax to Albany and to forward it thence to New York by the People's Line of steamboats. The Steamboat company *refused* to receive the flax, and the court held that thereupon the Railroad Company's obligation as a carrier ceased, but that "on the refusal of the steamboat proprietors to receive the property, the company should either have communicated the fact to the plaintiff, and awaited further instructions, or it should have relieved itself from liability, by depositing the hemp for safe-keeping in a suitable warehouse. (*Forsyth v. Walker*, 9 Penn. St. 148; *Goold v. Chapin*, 20 N. Y. 259; *Fisk v. Newton*, 1 Denio 451.)" Where a connecting line notifies the first carrier that it cannot receive the goods and transport them to their destination because of a block in freight, this will not relieve the first carrier from liability for damages caused by the delay, where it fails to notify the shipper and give him an opportunity to dispose of the property or take measures for its preservation. (*In re Petersen v. Case*, 21 Fed. 885.) In *The Convoy's Wheat*, 3 Wall. 225, the Supreme Court of the United States held that where a bill of lading, signed by a master, shows that a voyage to a particular place named on it is but part of a longer transit which it is understood is to be made by the cargo shipped, and that the cargo is to be carried forward in a continuous way on its further voyage, the master must be pre-

sumed to have contracted in reference to the course of trade connected with getting the cargo forward, and that in such a case, if any obstacle should intervene, which by the regular course of the trade is liable to occur and for a short time retard the forwarding, the master cannot, from a mere inability to find storage at the *entrepot,* turn about, and taking the cargo to some near port, store it there, inform the consignees, and clear out. He should notify them by telegraph of his difficulty and receive their instructions. "There is no authority which holds that on refusal of freight by a consignee, or non-delivery through other obstacles, notice is not required to the consignor or persons known by the carrier to be owners or interested in the goods. The law is the other way. *Louisville & Nashville R. R. Co. v. Duncan,* 137 Alabama, 446." (*Michigan Cent. R. Co. v. Harville,* 136 Ill. App. 243, 253.) To the same effect is *Edson Keith & Co. v. Atchison, T. & S. F. Ry. Co.,* 192 Ill. App. 350, 356. Many other cases supporting our position might be cited, but it is not necessary to do so as it appears that the defendant has practically ignored, in its argument, this vital principle of law. It is stipulated that "no notification was at any time given to plaintiff by defendant of the failure of Triangle Steamship Company at any time to accept said shipment, and no notice was ever given to plaintiff by the defendant at any time that said shipment was delivered by the defendant to the Triangle Steamship Company on August 6th, 1919," and no notice of any kind was given by the defendant to the plaintiff that the meat was on a lighter in the North River, and without icing or refrigeration.

We believe that when the provisions in paragraphs 3 and 5, upon which the defendant relies, are considered in the light of the law that we are about to state, it will appear that they were not intended to apply to cases where shipments are damaged through the negligence of the carrier, but if it be assumed that the said pro-

visions were so intended, the further question is presented: Can the defendant by provisions in a bill of lading exempt itself from liability for its negligence? In *Chicago & N. W. Ry. Co. v. Chapman,* 133 Ill. 96, 107, the court states: "Whatever may be the rule elsewhere, in this State the common carrier can not contract for exemption from responsibility for a failure on its part, or that of its servants, to exercise ordinary care in the transaction of its business. If the carrier may by contract limit its liability for gross negligence or willful misfeasance to any extent, it may contract for total exemption. A contract for exemption from liability for its torts being void, as against public policy, it can not shield itself as to any portion of the damages to person or property occasioned by its gross negligence or willful misconduct." In *Chicago & N. W. Ry. Co. v. Calumet Stock Farm,* 194 Ill. 9, the court cites with approval the above rule of law. The defendant contends that the Supreme Court 'of the United States has held in a number of decisions that a common carrier engaged in an interstate shipment may limit its common law liability by stipulations in a bill of lading, and it apparently argues that these decisions are broad enough to warrant a holding in the present case that the provisions in paragraphs 3 and 5 are valid and exempt the defendant from liability for damage to the shipments through its negligence. The following cases, cited by the defendant, of course, do not sustain its position. In *Missouri Pac. R. Co. v. Porter,* 273 U. S. 341, the court stated that there was "no claim that the loss was caused by any fault or negligence of the carrier." In *Missouri Pac. R. Co. v. Prude,* 265 U. S. 99, the plaintiff purchased from the Missouri Pacific Railroad Company a round-trip ticket to travel over the lines of that railroad company to Texarkana, Arkansas, thence over the Texas Pacific Railroad to Longview, Texas, and from that point over the International & Great Northern Railroad to Hous-

ton, Texas, and return via the same route, and she claimed that while on the line of the last-named company she was assaulted by the auditor of that company. The ticket contained the following provision: "In selling this ticket and checking baggage hereon, the selling carrier acts only as agent and is not responsible beyond its own lines." The Supreme Court held (*inter alia*) that such a provision was valid and that the assault did not constitute a breach of the initial carrier's contract for safe transportation. In *American Ry. Exp. Co. v. Levee*, 263 U. S. 19, the Supreme Court merely held that a provision in the receipt given the plaintiff by the defendant limiting the amount of liability in case of loss in consideration of the rate charged for carrying the property, which was dependent upon the value thereof and was based upon an agreed valuation, was valid under the federal law, whatever may have been the law of Louisiana, where the suit was brought. To the same effect is *Lancaster v. McCarty*, 267 U. S. 427. The federal law, bearing on the instant question, is plain "that it is not just and reasonable in the eye of the law for a common carrier to stipulate for exemption from responsibility for the negligence of himself or his servants." (*New York Cent. R. Co. v. Lockwood*, 17 Wall. 357, 384. See also *Muser v. Holland*, 17 Blatchf. 412; *Missouri Pac. Ry. Co. v. Harper Bros.*, 201 Fed. 671, 674.) "In upholding the right to contract many courts have gone so far as to rule that a common carrier may even stipulate for exemption from responsibility for its own negligence. But the Supreme Court of the United States has never accepted this view. In a series of decisions beginning with the great case of *Railroad Co. v. Lockwood*, 17 Wall. 357, 21 L. Ed. 627, it has consistently held that any contract which excuses a common carrier from negligence in the performance of its duty is contrary to public policy and void." (*Pierce Co. v. Wells Fargo & Co.*, 189 Fed. 561, 565.)

In the reply brief of the defendant our attention is directed to paragraph 1 of part I of "Conditions" in the bill of lading, which reads as follows: "No carrier . . . in possession . . . of the property herein described, shall be liable for any loss thereof, or damage thereto, by causes beyond its control; or by floods or by fire; or by quarantine; or by riots, strikes or stoppage of labor; or by leakage, breakage, chafing, loss in weight, change in weather, *heat*, frost, wet or decay; or from any cause if it be necessary or is usual to carry such property upon open cars." The defendant contends that *Missouri Pac. R. Co. v. Porter, supra,* is "a direct holding to the effect that Section 1 of the bill of lading in this suit is valid and binding," and it further contends that the provision in reference to *heat* in said section "is directly applicable to this claim and even if nothing further appeared in the bill of lading the decision herein would necessarily be in favor of the carrier." *Missouri Pac. R. Co. v. Porter* merely holds that a stipulation in a bill of lading exempting a carrier from liability for loss of such shipment by fire, is valid, where it appears that the damage *was not due to the carrier's negligence,* and that a State law forbidding such a stipulation is invalid in view of the occupation of the field by Congress. Tested by the law bearing upon the subject, paragraph 1, so far as it is applicable to the instant contention, should be construed to mean no more than that the carrier shall not be liable for any damage to property in its possession caused by heat, where the carrier has not been negligent. The defendant concedes that the heat in New York City at the time in question was not unseasonable for midsummer, and if the heat be considered a proximate cause of the damage to the meat, nevertheless, this does not exempt the defendant from liability, as it is clear from the evidence that the negligence of the defendant was also a proximate and con-

curring cause of the damage. One of the shipments of meat was delivered to the defendant on July 18, 1919; the other on July 19, 1919. The first arrived in Croxton on July 22, and the second on the next day. The meat remained there in the cars without icing or refrigeration for five days and was then unloaded from the cars to a lighter owned and controlled by the defendant, upon which it remained for a further period of nine days without icing or refrigeration service of any kind. The defendant knew that the meat was perishable. That it would rot and become unfit for human consumption if exposed, for the period in question, to the temperature that prevailed in New York City at that time, without icing or refrigeration, is undisputed. The maximum heat on the following days was: July 22, seventy-seven degrees; 23, eighty-three degrees; 24, eighty-nine degrees; 25, eighty-three degrees; 26, eighty-four degrees; 27, ninety-two degrees; 28, ninety-one degrees; 29, eighty degrees; 30, eighty degrees; 31, eighty-one degrees, and August 1, eighty-two degrees. The evidence shows that borax that was placed on the meat for the purpose of preserving it in shipment, would break down or melt at sixty degrees and that when that occurs it leaves the meat exposed and deterioration thereupon starts. The defendant neither cared for the shipments in any way nor did it give the plaintiff an opportunity to do so. It had the undoubted right to make delivery to the Steamship Company on the latter's pier on July 28. It failed to do so and negligently and unnecessarily allowed the meat to remain on the lighter for nine days in the midsummer heat without icing or refrigeration.

Under all the circumstances of this case, we hold that the defendant was guilty of negligence and a breach of duty and that the negligence proximately contributed to the damage sustained by the plaintiff, and that the provisions of the bills of lading, upon which the

defendant relies, do not exempt it, under the law, from responsibility for such negligence and breach of duty. In our judgment, it would be highly unjust to permit the defendant, under the record in this case, to escape liability. The judgment of the superior court of Cook county should be and it is affirmed.

*Affirmed.*

GRIDLEY, P. J., and BARNES, J., concur.